# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| AVA-GAYE BLACKFORD-WEBB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:24cv1071 |
| | ) | |
| GLOBAL SCHOLARS ACADEMY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on the Motion to Dismiss (Docket Entry 6) (the "Motion") filed by Global Scholars Academy (at times, the "GSA"). For the reasons that follow, the Court should grant in part the Motion, in that the Court should dismiss all federal claims and should remand all state claims to state court.

## BACKGROUND

This case arises from the tenure of Ava-Gaye Blackford-Webb (the "Plaintiff") at GSA. (See, e.g., Docket Entry 3 (the "Complaint") at 2-3.)[1] Alleging that she experienced "[d]iscrimination" and "harassment" (id. at 1) due to her national origin (see id. at 2), along with conduct giving rise to six other "cause[s] of action" (id. at 8 (all-cap and bold font omitted); see

_____

1 Docket Entry page citations utilize the CM/ECF footer's pagination.

id. at 1, 8-15), Plaintiff, proceeding pro se, filed suit in Durham County Superior Court (see id. at 1), "as Plaintiff worked in the County of Durham" (id. at 2) for GSA, which "operate[s] in Durham County" (id.). Asserting that federal "[j]urisdiction exists under Title VII of the Civil Rights Act of 1964 as amended [('Title VII')] because Plaintiff claims [GSA] violated her employment rights based on her national origin" (Docket Entry 1 at 2), GSA removed the action to this Court on the basis of so-called federal question jurisdiction (see id. at 1). See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); see also 28 U.S.C. § 1367(a) (authorizing exercise of supplemental jurisdiction over related state-law claims).[2]

GSA subsequently moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules"), asserting that the Complaint, inter alia, "fails to state a claim for which relief can be granted." (Docket Entry 6 at 1.)[3]

_____

[2] Per the Complaint, Plaintiff and GSA both qualify as residents of North Carolina (see Docket Entry 3 at 1-2), depriving this Court of so-called diversity jurisdiction, see 28 U.S.C. § 1332(a)(1) (providing jurisdiction over actions "between . . . citizens of different States").

[3] Notwithstanding that it removed this action to federal court, GSA also purports to seek dismissal pursuant to Rule 12(b)(1) on the grounds that "[t]he [C]omplaint does not establish subject matter jurisdiction" (id.). However, GSA fails to develop
(continued...)

2

Plaintiff responded in opposition to the Motion by filing an affidavit (see Docket Entry 10) (the "Affidavit"), along with more than two hundred pages of exhibits (see Docket Entries 10-1 to 10-21) and twelve videos (see, e.g., Docket Entry 10-6 at 1 ("See recording on flash drive!" (bold font omitted)); see also Docket Entry dated Jan. 30, 2025 (noting receipt of flash drive); Docket Entry 12 at 2 (emphasizing that Plaintiff's response "included 21 exhibits, 12 of which are recordings, and 2 recordings are not identified as an exhibit")). In addition to responding to various dismissal arguments, the Affidavit elaborates upon and supplements the Complaint's allegations. (See Docket Entry 10 at 1-27.) Contesting the propriety of Plaintiff's responsive materials, GSA filed a reply in support of its Motion. (See Docket Entry 12.)

## DISCUSSION

### I. Rule 12(b)(6) Standards

A Rule 12(b)(6) motion "tests the sufficiency of a complaint," but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). Accordingly, in reviewing a Rule 12(b)(6) motion, the Court must "accept the facts

---

3(...continued)
an intelligible jurisdictional argument; at best, GSA appears argue that the Complaint does not establish that GSA violated Plaintiff's rights. (See generally Docket Entries 7, 12.) Rule 12(b)(6), not Rule 12(b)(1), constitutes the appropriate vehicle for such a challenge.

3

alleged in the complaint as true and construe them in the light most favorable to the plaintiff." Coleman v. Maryland Ct. of App., 626 F.3d 187, 189 (4th Cir. 2010), aff'd sub nom., Coleman v. Court of App. of Md., 566 U.S. 30 (2012).  The Court must also "draw all reasonable inferences in favor of the plaintiff." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (emphasis added) (internal quotation marks omitted).

Additionally, a pro se complaint must "be liberally construed" and "held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks omitted).  "But liberal construction does not mean overlooking the pleading requirements under the [Rules]." Seabrook v. Driscoll, No. 20-1961, __ F.4th __, __, 2025 WL 2202135, at *2 (4th Cir. Aug. 4, 2025) (internal quotation marks omitted). Rather, "[l]iberal construction means only that[,] if the [C]ourt can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so." Bright v. United States Dep't of Just. DEA, Civ. Action No. 4:07-3002, 2008 WL 4335535, at *3 (D.S.C. Sept. 16, 2008), aff'd, 318 F. App'x 243 (4th Cir. 2009).  Importantly, "[a] court may not construct the plaintiff's legal arguments for h[er], nor should a court conjure up questions never squarely presented." Id. (citation and internal quotation marks omitted); see also Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985) ("Even in the case of pro se

4

litigants, [courts] cannot be expected to construct full blown claims from sentence fragments[] . . . .").

Moreover, in analyzing any complaint, the Court "will not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc., 707 F.3d 451, 455 (4th Cir. 2013) (internal quotation marks omitted); see also Giarratano v. Johnson, 521 F.3d 298, 304 n.5 (4th Cir. 2008) (explaining that the United States Court of Appeals for the Fourth Circuit has "not read *Erickson* to undermine [the] requirement that a pleading contain more than labels and conclusions" (internal quotation marks omitted)). The Court can also "put aside any naked assertions devoid of further factual enhancement." SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 422 (4th Cir. 2015), as amended on reh'g in part (Oct. 29, 2015) (internal quotation marks omitted).

To avoid Rule 12(b)(6) dismissal, a complaint must contain sufficient factual allegations "to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To qualify as plausible, a claim needs sufficient factual content to support a reasonable inference of the defendant's liability for the alleged misconduct. See id. "Where a complaint pleads facts that are merely consistent with a defendant's

5

liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks omitted). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id.

In other words, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Moreover, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint" cannot "survive a Rule 12(b)(6) motion." Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted). "At bottom, determining whether a complaint states . . . a plausible claim for relief . . . will 'be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Iqbal, 556 U.S. at 679).

Finally, in ruling on a Rule 12(b)(6) motion, "a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." E.I. du Pont, 637 F.3d at 448. The Court may also consider documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Generally, a "court cannot go

6

beyond these documents" without "convert[ing] the motion into one for summary judgment," an action from which courts should refrain "where the parties have not had an opportunity for reasonable discovery." <u>E.I. du Pont</u>, 637 F.3d at 448.

## II. Title VII Discrimination Claim

Under Title VII, "an employer" may not, inter alia, "discharge any individual, or otherwise to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1).[4]  For Title VII purposes, an "'employer' means a person engaged in an industry affecting commerce who [employs a certain number of employees] . . . and any agent of such a person." 42 U.S.C. § 2000e(b).  As the Fourth Circuit has explained:

> [u]ltimately, a plaintiff bringing an employment discrimination claim under Title VII . . . must provide supporting evidence through one of two methods: (1) direct or circumstantial evidence that discrimination motivated the employer's adverse employment decision, or (2) the *McDonnell Douglas* pretext framework that requires the plaintiff to show that the employer's stated

---

4  In other words, Title VII "do[es] not provide a cause of action against co-employees or supervisors; the cause of action is against the employer." <u>Rageh v. University of N.C.</u>, No. 1:24cv336, 2024 WL 5056448, at *2 (M.D.N.C. Dec. 10, 2024); <u>see also</u> <u>Lissau v. Southern Food Serv., Inc.</u>, 159 F.3d 177, 178 (4th Cir. 1998) (explaining that "[e]mployees are not liable in their individual capacities for Title VII violations").

permissible reason for taking an adverse employment action is actually a pretext for discrimination.

Bing v. Brivo Sys., LLC, 959 F.3d 605, 617 n.8 (4th Cir. 2020) (internal quotation marks omitted). "Absent direct evidence, the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman, 626 F.3d at 190. Nevertheless, "an employment discrimination plaintiff need not plead a prima facie case of discrimination to survive a motion to dismiss." Bing, 959 F.3d at 616 (internal quotation marks omitted). "Instead, a Title VII plaintiff is required to allege facts to satisfy the elements of a cause of action created by that statute." Id. (internal quotation marks omitted). "Accordingly, [the present] inquiry is whether [Plaintiff] alleges facts that plausibly state a violation of Title VII above a speculative level." Id. at 617 (internal quotation marks omitted).

Liberally construed, the Complaint alleges that GSA discriminated against Plaintiff, due to her Jamaican national origin, by (1) demoting her from the Literacy Coach and Testing Coordinator role to a classroom teacher and Testing Coordinator role for the 2023-2024 school year, and potentially demoting her from the Testing Coordinator role during the 2023-2024 year, (2) firing her from her from her role in the After-School program

8

in November 2023, and (3) terminating her employment at the end of January 2024, with the termination effective as of February 29, 2024. (See Docket Entry 3 at 1-17.) To establish a connection between these actions and Plaintiff's nationality, the seventeen-page Complaint includes only the following eight paragraphs:

> Plaintiff[] is informed and believes and on that basis[] alleges that Defendant(s) Global Scholars Academy is a charter school operated by the Head of School who along with other staff members discriminated against the plaintiff, subjected the plaintiff to different terms and conditions of employment, harassed the plaintiff, demoted the plaintiff to a less desirable position due National of [sic] Origin, Jamaica, made physical threats and defamed the plaintiff's character causing immense emotional distress. This affected the plaintiff's ability to conduct her job because of the hostile/toxic environment that was created and the humiliation she had to endure.

(Id. at 2 (capitalization in original).)

> The plaintiff alleges that throughout her tenure at the school on are [sic] about July 11, 2022-January 29, 2024 she experienced unwelcome and persistent conduct that created a hostile work environment. The plaintiff was harassed, threatened in and outside of the defendant's location, verbally abused, subjected to working in a hostile working environment/condition and told every single day that she should go back to Jamaica by different staff members. The plaintiff was also told that she had better leave the school before they have to drag her out. Remarks were also passed on more than one occasion that the plaintiff is going to be shot in her head. The plaintiff was also called a thief. Misleading information was also spread in and out of defendant's location and it escalated when the plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC). Mention and remarks were also made about members of the plaintiff's family on many occasions. This affected the plaintiff's emotional well-being, and overall job satisfaction. The plaintiff made a number of attempts to address the issue: such as efforts to resolve the harassment internally, like requesting a meeting with

9

the Board of Directors. This was not honored until the plaintiff received a termination letter and had to request a due process hearing with the Board of Directors which resulted in the BOD upholding the defendant's decision to terminate the plaintiff's contract, even though the plaintiff was not at fault and she was not given the opportunity to resign. During the meeting the plaintiff posed a number of questions in order to seek clarity. None of the questions were answered during the meeting.

(Id. at 2-3.)[5]

On or about July 16, 2023, the plaintiff was demoted from her post as a Literacy Coach and Testing Coordinator to a less desirable position due to National of [sic] Origin, during an End of Year meeting without following protocol and no reasonable cause (plaintiff went above and beyond to accomplish all that was required and laid out in the job description). The demotion negatively impacted the plaintiff's career progression, professional reputation, and earning potential. The plaintiff believes that the demotion was based on discriminatory motives, and was unjustified based on the plaintiff's performance. Plaintiff was told by the defendant that the teachers were pushing back and she [sic] could only offer the plaintiff a classroom teacher position. The defendant told the plaintiff that she will never be a coach and if the plaintiff does not want the job as a classroom teacher she should go to another school. The plaintiff was also told that she is not a good fit for the school. The defendant also made mention of the beginning of the year zoom meeting where she [sic] had the plaintiff's picture displayed in front of the entire staff saying that she [sic] has to get the plaintiff on the right seat on the bus, which was very humiliating. The plaintiff was presented with a contract that said 3rd, 4th or 5th Grade classroom Teacher. Subsequently, the defendant agreed that the plaintiff could also keep the Testing Coordinator position. On or about July 13, 2023, the plaintiff was subjected to different terms and conditions and was sent an email that the plaintiff's

_____

5 The EEOC charge that Plaintiff submitted with her Complaint (compare Docket Entry 1-2 at 1, with Docket Entry 3 at 1) reflects a filing date after her termination from GSA (see Docket Entry 1-2 at 3).

teaching assignment for the 23-24 school year is Middle
School ELA/Social Studies, without even consulting with
the plaintiff.  This was a breach of contract and the
plaintiff was subjected to different terms and conditions
of employment.

(Id. at 3-4 (capitalization in original).)

      The plaintiff was treated differently than others
due to national of [sic] origin.  On July 16, 2023, the
Defendant, without justification, demoted Plaintiff from
the position of Literacy Coach & Testing Coordinator to
the position of Middle School ELA Teacher (the plaintiff
made a request to retain the Testing Coordinator job),
which involved significantly reduced responsibilities,
and a diminished level of authority.  The demotion was a
direct result of discriminatory and retaliatory reasons.
The Defendant's actions were intended to harm Plaintiff's
career prospects.  These actions negatively affected the
plaintiff, such as being fired, or receiving unequal
treatment compared to others similarly situated.  The
plaintiff was made to appear as if she was stupid and was
also told that she does not know anything.

(Id. at 9 (capitalization in original).)

      The defendant employed another Literacy Coach while
the plaintiff was hired as a Literacy coach.  The
defendant kept passing remarks that they can't have a
Jamaican coaching Americans.  Passed remarks everyday
that I should go back to Jamaica.  In a meeting held at
the beginning of the school year the defendant displayed
the plaintiff's picture and said that she [sic] has to
get the plaintiff on the right seat on the bus.  The
defendant assigned my role as a Testing Coordinator to
another teacher after she [sic] told me that she [sic]
can take my job and give it to the same teacher.  The
assistant head of school kept asking the plaintiff, 'Are
you for the devil or for the Lord?' for no apparent
reason.  The plaintiff was baptized on April 10, 2022.
On or about June 16, 2023, I was told that I am not a
good fit for the school.

(Id. (single quotation marks in original).)

11

On or about July 11, 2022-January 29, 2024, the defendant discriminated against the plaintiff and told her every single day to go back to Jamaica.

(Id.)

The plaintiff was wrongfully terminated on January 29, 2024 and was escorted off campus by a police officer. During the defendant's [sic] tenure at Global Scholars Academy the defendant [sic] was told everyday that she should return to Jamaica.

(Id. at 10.)

The plaintiff alleges that the defendant continuously shares misleading information in and out of the defendant's location even after the defendant [sic] was fired. The defendant has contacted the plaintiff's current employer in an effort the [sic] jeopardize the plaintiff's job. The defendant has shared offensive and derogatory information, racial or ethnic comments and provided an unwelcoming work environment. The defendant has uttered comments about the plaintiff's religion. On a number of occasions, the defendant asked the plaintiff "Are you for the devil or are you for the Lord?" Comments have been made about the plaintiff's appearance. The plaintiff also faced intimidation or aggressive pressure. The plaintiff was discriminated against because of Nationality [sic] of [sic] Origin. The defendant subjected the plaintiff to different terms and conditions of employment, demoted the plaintiff to a less desirable position due National [sic] of Origin, Jamaica, and made physical threats. The defendant kept harassing the plaintiff about her Master's Degree. The defendant stated "You have a Master's Degree in Educational Administration and Leadership right? Why don't you go to another school to become principal." This was said in a very abusive manner. Comments were also passed about why the plaintiff has multiple degrees etc. As a result of this harassment, the Plaintiff is owed a total of $300,000. The harassment occurred as a result of the plaintiff's Nationality [sic] of Origin.

(Id. at 14-15 (capitalization in original) (stray marks omitted).)[6]

---

[6] The Complaint requests a total of more than $1.2 million in
(continued...)

Notably, the Complaint contains more than eighty references to "the defendant" (see id. at 1-17), which references, from context, clearly do not signify GSA, the actual defendant in this case. Moreover, the Complaint uses the term "the defendant" to refer to multiple different individuals, without identifying such individuals. (See, e.g., id. at 5 (using male and female pronouns to refer to "the defendant").) For instance, in one paragraph, the Complaint alleges that, on August 30, 2023, as Plaintiff "sternly explained to [students]," whom the Complaint describes as "being disrespectful," how they needed to behave, "[t]he defendant came to the class and a student opened the door," after which Plaintiff "explained to the defendant what happened," and "[h]e then called [Plaintiff] to his office and had [Plaintiff] escorted off campus by a police officer." (Id. at 4-5 (emphasis added).) In the next paragraph, the Complaint asserts that,

> [o]n or about October 25, 2023 the defendant called the plaintiff to her office and verbally abused her. The defendant was very disrespectful and was asking weird questions and continued to yell at the plaintiff. The defendant asked the plaintiff why she likes to hold on to things and if she knows that she can take her job and give it to another teacher; which she did. The defendant told the plaintiff that she does not know anything. When the defendant [sic] didn't respond or over react [sic] to this verbal abuse the defendant got angry and told the plaintiff that it was a passive type thing. When the plaintiff tried to gain clarity, the defendant yelled at

---

6(...continued)
damages (id. at 15), with $200,000 attributable to Plaintiff's discrimination claim (see id. at 8-9).

13

the plaintiff and the defendant slammed <u>her</u> hand down on
        the table in a loud angry manner. . . .

(<u>Id.</u> at 5 (semicolon in original) (emphasis added); <u>see also, e.g.,</u>
<u>id.</u> at 7 ("On or about January 29, 2024 the plaintiff assigned a
benchmark for 8th Grade students to complete and a student was
disrespectful and said to the plaintiff that he is not the one who
is about to be fired.  I asked the Student Relations Officer to
speak to the student and the defendant came instantly and sent the
student to wait in <u>her</u> office and then asked the police officer to
escort the plaintiff off campus." (emphasis added)).)

        Contending that "Plaintiff makes no factual allegations to
support a claim for national origin discrimination" (Docket Entry
7 at 6 (bold and italicized font omitted)), GSA urges dismissal of
Plaintiff's Title VII discrimination claim (<u>see</u> <u>id.</u> at 6-9).  (<u>See</u>
<u>also</u> <u>id.</u> at 1 ("Plaintiff fails to plausibly allege claims for
national origin discrimination under Title VII because she offers
only conclusory allegations and speculation.").)  In so doing, GSA
emphasizes that, "[t]hroughout her [C]omplaint, Plaintiff has made
it unclear as [sic] to who [sic] she is referring to [sic] when she
states 'the defendant.'"  (<u>Id.</u> at 7; <u>see also, e.g.,</u> <u>id.</u> at 3 n.6
("Plaintiff refers to the defendant and a 'he' but did not identify
who the person was that called her to his office.  It is unclear
what occurred other than the police escorted [Plaintiff] off
campus.").)  Nevertheless, GSA correctly notes that the Complaint
does not connect any of the statements regarding Plaintiff's

                                  14

Jamaican nationality to "any decision maker or administrator" (id. at 7) involved in Plaintiff's (demotion(s) and) termination (see id. at 7-8). (See generally Docket Entry 3.) Accordingly, GSA maintains that "Plaintiff offers no direct evidence suggesting that national origin discrimination motivated GSA to fire her." (Docket Entry 7 at 8.)

As for the "pretext" approach, GSA contends that "Plaintiff proffers no comparators to state a claim for national origin discrimination" (id. (bold and italicized font omitted)) using the prima facie approach to asserting a Title VII discrimination claim. (See id. at 8-9.) In addition, GSA maintains that the Complaint fails to "identify any specific ways in which [Plaintiff] was treated differently than other employees due to her national origin," instead offering only the conclusory assertion that Plaintiff "received unequal treatment compared to others similarly situated." (Id. at 7 (internal quotation marks omitted).) GSA further emphasizes that, per her Complaint, Plaintiff's "termination occurred the day after she had to be escorted off campus by police, a third incident alleged in her [C]omplaint." (Id. at 8.)

In response to these arguments, Plaintiff submitted a lengthy affidavit that elaborates upon various allegations in the Complaint and adds additional allegations, including regarding events that happened months after her termination from GSA. (See Docket Entry

10; see also Docket Entries 10-1 to 10-21 (supporting exhibits).) Like the Complaint, the Affidavit continues to use the term "the defendant" to refer to actions by various individuals, not GSA. (See generally Docket Entry 10.) Unlike the Complaint, a handful of the Affidavit's more than 250 references to "the defendant" clarify the actor. (See, e.g., id. at 9-10 ("There was one incident where a teacher called the plaintiff a thief after she was asked by the defendant (Head of School) to go to the class to assist her."), 16 ("[A student] replied that he was going to open the door for the defendant (assistant head of school)."). Moreover, a comparison of the Affidavit to its more than two hundred pages of accompanying exhibits reveals the identity of the actor(s) involved in certain events. (Compare, e.g., id. at 15-16 (discussing letter in which, inter alia, "the defendant mentioned that 'students expressed that they are afraid of you'"), with Docket Entry 10-16 at 9-11 (containing referenced letter, which details various events noted in Affidavit).) Those incidents, however, do not involve any allegations regarding Plaintiff's nationality. (See Docket Entries 10 to 10-21.)

As for the allegations regarding Plaintiff's nationality, the Affidavit largely fails to associate them with any specific actor. (See Docket Entry 10 at 1-27.) At best, the twenty-seven-page Affidavit contains four nationality-related allegations that

16

provide at least some identification of relevant actors, as
follows:

> The Plaintiff was hired as a Literacy Coach and Testing
> Coordinator for GSA on or about July 11, 2022. The
> plaintiff was told daily that she should go back to
> Jamaica. An administrator reiterated that they can't
> have a Jamaican Coaching Americans. Subsequently another
> coach was hired while the plaintiff was a Literacy Coach.
> This coach that was hired worked on similar tasks that
> the plaintiff worked on with the teachers. Federal laws
> prohibit discrimination based on national origin in
> employment. . . .

(Id. at 2 (capitalization in original).)[7]

> The defendant demoted the plaintiff on or about July
> 16, 2023. . . . The explanation given was discriminatory
> where the defendant mentioned that the teachers were
> pushing back obviously because the plaintiff was
> Jamaican.

(Id. at 4; cf. Docket Entry 3 at 4 ("Plaintiff was told by the

defendant that the teachers were pushing back and she could only

offer the plaintiff a classroom teacher position.").)

> The plaintiff went above and beyond every day while
> completing her tasks as a Literacy coach and Testing
> Coordinator all while members of staff passed racial
> slurs and comments that the plaintiff should go back to

---

7 The Affidavit indicates that this individual and Plaintiff
worked together as literacy coaches. (See, e.g., id. at 4-5
(alleging that, "despite being qualified, the plaintiff was demoted
from the position[,] and the Literacy Coach who was hired remained
in the position after the plaintiff's termination" (capitalization
in original)), 7 ("As a Literacy Coach the plaintiff was asked to
substitute for absent teachers on many occasions even when
sufficient notice was given that a teacher was going to be absent.
This was not the plaintiff's main duty. The other Literacy coach
who was hired was never asked to act as a substitute. It would be
understandable if this was done occasionally. However, as soon as
a teacher is absent the plaintiff is the one sent to the class."
(capitalization in original)).)

Jamaica. To rectify the problem a professional development on Discrimination in the Workplace would have been a step in the right direction. **This [demotion from Literacy Coach] was entirely based on national of [sic] origin. . . .**

(Docket Entry 10 at 5 (capitalization and bold font in original).)

During the school year different members of staff including administrators passed remarks about the plaintiff's nationality including that they can't have a Jamaica[n] coaching Americans. **Remarks were also passed every day that the plaintiff should go back to Jamaica. They would further add that the plaintiff's 'time was up'.** This caused the plaintiff emotional distress and created an unwelcoming and hostile environment. These kinds of statement convey a sense that the plaintiff is not supposed to be at GSA. The defendant told the plaintiff that she wasn't a good fit for the school. Such phrases are deemed by the United States federal government and the court system to be discriminatory in the workplace. This is a racist or xenophobic epithet and unlawful workplace conduct by co-workers. The statements above were also accompanied by insults, taunting, or ethnic epithets, such as making fun of the plaintiff's speech which are deemed to be "harassment based on national origin." . . . The defendant including co-workers and administration created a hostile working environment in an effort to get the plaintiff to quit. . . .

(Id. at 8-9 (bold font and single quotation marks in original).)

Title VII "do[es] not make employers vicariously liable for the discriminatory acts and motivations of everyone in their employ, even when such acts or motivations lead to or influence a tangible employment action." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 287 (4th Cir. 2004) (en banc), overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009); see also id. ("On the contrary, by defining employer to include 'any agent' of the employer, Congress evinced

18

an intent to place some limits on the acts of employees for which employers are to be held responsible." (brackets, ellipsis, and certain internal quotation marks omitted)). Instead, an employer possesses liability for the discriminatory actions of "its employees holding supervisory or other actual power to make tangible employment decisions." Id.; see also id. at 291 ("Regarding adverse employment actions, an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision. This encompasses individuals who may be deemed actual decisionmakers even though they are not formal decisionmakers . . . ."). The Complaint does not connect the comments regarding Plaintiff's nationality to any particular individual, let alone an individual with supervisory or other actual decisionmaking authority regarding Plaintiff's role and employment at GSA. (See Docket Entry 3 at 1-17.)

The Complaint likewise offers only conclusory assertions that (1) national origin animus motivated Plaintiff's demotion from literacy coach and eventual termination and (2) that "similarly situated" (id. at 9) employees experienced different treatment from Plaintiff. (See id. at 1-17.) Such conclusory assertions fail to establish a viable claim. See, e.g., Iqbal, 556 U.S. at 678; SD3, 801 F.3d at 422. Moreover, the Complaint reveals that Plaintiff experienced friction with classroom teachers in her role as a

19

literacy coach (see, e.g., Docket Entry 3 at 7 ("[A] teacher chas[ed] the plaintiff out of her class room [sic] and passed a remark that the plaintiff was a thief.  This occurred while the plaintiff was employed a[s] a Literacy Coach and she was asked to go to the teacher's room to assist her.")) and that, in changing Plaintiff from a literacy coach to classroom teacher, "the defendant" told Plaintiff "that the teachers were pushing back and she could only offer the plaintiff a classroom teacher position" rather than the coach position (id. at 4).  The Complaint further reveals that between August 30, 2023, and Plaintiff's termination on or about January 30, 2024, inter alia, (1) police escorted Plaintiff from GSA on at least two occasions (see id. at 4-5, 7, 10); (2) Plaintiff resisted instruction from "an administrator" (id. at 6 (internal quotation marks omitted)) on at least one additional occasion; and (3) Plaintiff left during the After-School program, with at best limited notice to relevant personnel, on the same day that some unspecified incident "occurred during dismissal," resulting in Plaintiff's firing from the After-School program (id. at 5-6).[8]  These factual allegations render

_____

[8]  Plaintiff disputes whether she appropriately notified school officials before leaving during the After-School program and whether she appropriately documented the incident (see id.) and thus whether, as an email associated with her firing from the After-School program stated, she "put the safety of the students at risk and the overall liability of the school in jeopardy" (id. at 5 (internal quotation marks omitted)).  "Although [Plaintiff] disputes the [description of her actions], she has alleged no
(continued...)

20

implausible the Complaint's contention that national origin discrimination motivated Plaintiff's demotion and various firings, warranting dismissal of Plaintiff's Title VII employment discrimination claim. See, e.g., Woods v. City of Greensboro, 855 F.3d 639, 649 (4th Cir. 2017) ("[U]nder *Iqbal* and *Twombly*, the Court must consider the plausibility of inferring discrimination based on [the plaintiff's] allegations in light of an 'obvious alternative explanation' for the conduct. In other words, while [the plaintiff] need not establish a prima facie case at this stage, . . . [the Court] must be satisfied that the [defendant's] explanation for [the contested action] does not render [the plaintiff's] allegations implausible." (citation omitted) (quoting Iqbal, 556 U.S. at 682)); Nathan, 707 F.3d at 455 (explaining that, in analyzing Rule 12(b)(6) motions, courts "will not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments" (emphasis added) (internal quotation marks omitted)).

The Affidavit and supporting exhibits fail to salvage Plaintiff's Title VII discrimination claim. As an initial matter, GSA correctly notes that "parties cannot amend their complaints

---

8(...continued)
factual basis to support the conclusion that discriminatory bias, rather than [such perception] of [her actions], was the [relevant actor(s)'] true motivation for [firing] her," Seabrook, __ F.4th at __, 2025 WL 2202135, at *3, undermining her Title VII claim. (See Docket Entry 3 at 5-6.)

through briefing" (Docket Entry 12 at 4 (internal quotation marks omitted)). See, e.g., Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy."). In any event, if the Court treated the Affidavit as an amended complaint, it would still fail to establish a viable Title VII discrimination claim. To begin, the Affidavit largely relies on speculative and conclusory assertions regarding discriminatory motives. (See, e.g., Docket Entry 10 at 4 ("The explanation given [for Plaintiff's role change] was discriminatory where the defendant mentioned that the teachers were pushing back obviously because the plaintiff was Jamaican.").) Moreover, although the Affidavit alleges that "[a]n administrator reiterated that they can't have a Jamaican [c]oaching Americans," the Affidavit provides no details regarding the context of this statement, including any indication whether the "administrator" possessed any decisionmaking authority regarding Plaintiff's employment. (Id. at 2.) Notably, the Affidavit asserts that only certain administrators possessed supervisory authority regarding Plaintiff's role. (See, e.g., id. at 22 (maintaining that Plaintiff did not engage in insubordination for failing to comply with instructions from "an administrator" because that individual "was not the plaintiff's direct supervisor" and "refusing to follow instructions from someone outside of the

22

plaintiff's reporting structure is not typically classified as insubordination").)

Additionally, the Affidavit contains excerpts from Plaintiff's termination correspondence (see, e.g., id. at 14-15), which appear in the exhibits thereto (see, e.g., Docket Entry 10-16 at 2-8 (emails regarding After-School program termination), 9-11 (letter regarding employment termination recommendation)). These materials indicate that the incidents involving police escorting Plaintiff from campus and Plaintiff refusing to comply with directives and protocols, as well as Plaintiff leaving students unsupervised and Plaintiff's students stating that they feared her, prompted the relevant termination decisions. (See, e.g., Docket Entry 10 at 14-16, 22; see also Docket Entry 10-16 at 2, 5 (outlining bases for After-School termination, including leaving students unattended and failing to notify appropriate staff regarding a "hitting incident" between students), 9-11 (outlining bases for termination recommendation, including repeated instances of yelling at students and refusing to follow directives, explaining that GSA "cannot allow any adult to yell and scream aggressively at students at any given moment" and that "some of [Plaintiff's] students have expressed that they are afraid [Plaintiff]," and further observing that "[c]hildren cannot learn in an environment in which they have fear").) These circumstances render implausible Plaintiff's contentions that national-origin discrimination motivated GSA's

23

adverse employment decisions.  See Woods, 855 F.3d at 649; see also Bing, 959 F.3d at 617 ("The facts [the plaintiff] pled about his termination cannot be construed to plausibly state a claim that he was terminated because of his race.  In fact, [the plaintiff] specifically alleged a non-racial reason for the termination.").  Thus, even if considered, Plaintiff's Affidavit fails to plausibly allege a viable Title VII discrimination claim, necessitating its dismissal.  See, e.g., Bing, 959 F.3d at 618 ("[The] complaint fails not because of unsophisticated language or the failure to adhere to formalities.  It fails because [the plaintiff] pled a non-discriminatory basis for his termination and no facts to support his conclusory allegations about the [events that led to his termination].").

### III. Title VII Hostile Work Environment Claim

As for Plaintiff's hostile work environment claim, "[a] hostile environment that violates Title VII exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Seabrook, ___ F.4th at ___, 2025 WL 2202135, at *4 (internal quotation marks omitted).  "To make such a claim, [Plaintiff] must show she was subjected to (1) unwelcome conduct, (2) based on her [national origin], that was (3) severe or pervasive enough to make her work environment hostile or abusive

24

and (4) imputable to [GSA], her employer." <u>Bazemore v. Best Buy</u>, 957 F.3d 195, 200 (4th Cir. 2020). "Importantly, the existence of unwelcome conduct, based on an employee's [national origin], that is severe or pervasive enough to create a hostile work environment, is not on its own enough to hold an employer liable." <u>Id.</u> at 200-01. "For an employer to be liable, the harassing employee's conduct must also be imputable to the employer. And to survive a Rule 12(b)(6) motion to dismiss, an employee must allege sufficient facts to plausibly satisfy the imputability requirement." <u>Id.</u> at 201.

More specifically, "[i]f the harasser is a co-worker, then the employee must show that the employer was negligent in controlling working conditions — that is, the employer knew or should have known about the harassment and failed to take effective action to stop it." <u>Strothers v. City of Laurel</u>, 895 F.3d 317, 332 (4th Cir. 2018) (internal quotation marks omitted). "If the harasser is a supervisor, then the employer may be either strictly or vicariously liable for the supervisor's actions," <u>id.</u> at 333, "depend[ing] on whether the supervisor's harassment culminates in a tangible employment action," <u>id.</u> at 333 n.6 (internal quotation marks omitted). "[A] supervisor is an individual who has been empowered to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits." Id. at 333 (internal quotation marks omitted); see also id. (observing that, in adopting this standard, "the [United States Supreme] Court rejected the more open-ended approach which ties supervisor status to the ability to exercise significant direction over another's daily work" (internal quotation marks and ellipsis omitted)).

As noted above, the Complaint contains only two (non-conclusory) factual allegations regarding national origin harassment, namely that "[P]laintiff was . . . told every single day that she should go back to Jamaica by different staff members" (Docket Entry 3 at 2; see also id. at 9, 10) and that "[t]he defendant kept passing remarks that they can't have a Jamaican coaching Americans" (id. at 9). The Complaint does not, however, provide a sufficient basis upon which to impute this conduct to GSA. To begin, the Complaint does not identify the individuals who uttered such comments, beyond noting that "different staff members" (id. at 2) told Plaintiff she should return to Jamaica. (See, e.g., id. at 2, 9, 10.) Accordingly, the Complaint fails to connect these comments to a qualifying supervisor, let alone to any tangible adverse employment action by such individual. (See id.) Alternatively, assuming Plaintiff's coworkers uttered these comments, the Complaint still fails to plausibly allege grounds for imputing this conduct to GSA. At best, the Complaint asserts that

26

Plaintiff took "efforts to resolve the harassment internally, like requesting a meeting with the Board of Directors," which request "was not honored" until after she "received a termination letter." (Id. at 3.)[9] Without more, Plaintiff's unspecified "efforts" and the denial of her request for a meeting with GSA's Board of Directors does not establish that GSA "knew or should have known about the harassment and failed to take effective action to stop it." Strothers, 895 F.3d at 332 (internal quotation marks omitted). Thus, the Complaint fails to allege a viable Title VII hostile work environment claim.

Even if considered, the allegations in the Affidavit fare no better. The allegations regarding comments by unspecified "members of staff" (Docket Entry 10 at 5, 8) lack a factual basis for concluding that GSA "knew or should have known about the harassment," Strothers, 895 F.3d at 332 (internal quotation marks omitted). See Howard v. Winter, 446 F.3d 559, 567 (4th Cir. 2006) ("[A]n employee may not impute liability on an employer under a theory that the employer must exercise an all-seeing omnipresence over the workplace."). As for the allegation that "[a]n administrator reiterated that they can't have a Jamaican [c]oaching

---

9    Notably, the Complaint includes this assertion after detailing a litany of primarily non-nationality-related "unwelcome and persistent conduct," such as calling Plaintiff a thief, saying she "[wa]s going to be shot in her head" and "had better leave the school before they have to drag her out," and spreading unspecified "[m]isleading information" both before and after Plaintiff filed her EEOC charge. (Id. at 2-3.)

27

Americans" (Docket Entry 10 at 2), the Affidavit fails to establish that said administrator possessed any supervisory authority over Plaintiff (cf. id. at 22 (denying "an administrator" qualified as Plaintiff's supervisor)). Moreover, the Affidavit indicates that such comment occurred long before Plaintiff's demotion from the literacy coach position (see id. at 2 (alleging that, "[s]ubsequent[]" to said comment, "another coach was hired while the plaintiff was a Literacy Coach")), which further undercuts any inference that the speaker "ha[d] been empowered to take tangible employment actions against [Plaintiff]," Strothers, 895 F.3d at 333 (internal quotation marks omitted). Plaintiff thus fails to plead a viable national-origin-based Title VII hostile work environment claim.

### IV. Remaining Matters

GSA asserts that the Court should dismiss Plaintiff's Title VII claims with prejudice. (See, e.g., Docket Entry 7 at 2.) The Complaint qualifies as a version of a "shotgun pleading" wherein, rather than "assert[ing] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions," Doe v. Wyndham Hotels & Resorts, Inc., No. 2:24cv204, 2025 WL 725268, at *10 (E.D. Va. Mar. 6, 2025) (internal quotation marks omitted), the Complaint asserts multiple claims against one defendant based on the actions of multiple (largely undifferentiated) nonparties without identifying

28

which nonparty bears "responsib[ility] for which acts or omissions," id. (internal quotation marks omitted). See Turton v. Virginia Dep't of Educ., No. 3:14cv446, 2014 WL 12539403, at *2 (E.D. Va. Sept. 23, 2014) ("[T]his Amended Complaint is the quintessential 'shotgun pleading' that presents many different transactions, occurrences, and series of transactions or occurrences and that is presented in such a conclusory form that it is virtually impossible to ascertain what claims are asserted against which defendants and on what legal basis the respective claims are founded . . . ."); see also, e.g., Votaw v. Carthens, No. 1:21cv354, 2021 WL 3773409, at *3 (M.D.N.C. Aug. 25, 2021) ("Vagueness as to which party the phrase 'the Defendants' refers fails to provide each defendant the factual basis for the claims specifically against him or her and 'deprives them and the court of the opportunity of determining whether there are sufficient facts to make a claim against each Defendant plausible.'").

"The chief evil caused by these types of pleadings is that to one degree or another, defendants are not afforded adequate notice of the claims against them and the grounds upon which each claim rests[,] thereby impeding a meaningful response." United States v. Premier Med., Inc., No. 6:18cv165, 2023 WL 9060896, at *14 (D.S.C. Sept. 28, 2023) (brackets, ellipsis, and internal quotation marks omitted). "Not only do pleadings of this sort fail to apprise the opposing party of the particular claims against it (and the

29

potential extent of its liability), they also water down the rights of parties to have valid claims litigated efficiently and waste scarce judicial resources." Id.; see also, e.g., Watt v. HAL Antillen N.V., No. 2:24cv155, 2024 WL 4436966, at *2 (W.D. Wash. Oct. 7, 2024) ("Defendants are correct, however, that the repeated use of the undifferentiated word 'defendants' . . . is confusing in light of the allegations and claims. . . . . In this context, use of the term 'defendants' to identify the entities that . . . breached a duty owed to plaintiff would force defendants to guess what each of them is supposed to have done." (citation omitted)).

Notably, despite GSA alerting Plaintiff to this deficiency in moving to dismiss the Complaint (see, e.g., Docket Entry 7 at 3 n.7), Plaintiff continued to use the term "the defendant" to refer to the actions of various unidentified nonparties throughout her Affidavit (see generally Docket Entry 10). Moreover, the Affidavit veers into the delusional as it attempts to expand Plaintiff's Title VII claims to include a conspiracy involving unnamed members of the public harassing Plaintiff in various ways and locations, ranging from Walmart stores to her home to her new school (where she has similarly experienced termination from an After-School program), following her termination from GSA. (See, e.g., id. at 2-3; see also id. at 24 ("The plaintiff also does not feel safe in public spaces because the plaintiff has been followed around wherever she goes for leisure time or with family. This is in an

effort to get others to treat the plaintiff badly. The plaintiff has observed a number of unusual and weird happenings which is very frustrating. The plaintiff has been in different public spaces and remarks have been passed in relation to my past employer. I would like the [C]ourt to have the defendant to cease and desist from all malicious activity. This unlawful conduct is unacceptable.").)[10]

Under the circumstances, the Court should dismiss Plaintiff's Title VII claims with prejudice. See, e.g., Jackson v. Early Warning, Civ. Action No. 15-1233, 2016 WL 7228866, at *3-5, 9 (D. Md. Dec. 13, 2016) (dismissing pro se complaint with prejudice where, inter alia, "[the] [o]riginal [c]omplaint was a textbook example of a shotgun pleading" and "[the] [s]upplemental

_____

10  To the extent that Plaintiff attempts to assert a Title VII retaliation claim based on these allegations (see id. at 24 ("The defendant has been retaliating against the plaintiff because she filed a complained [sic] about discrimination with the Equal Employment Opportunity Commission, then requested a Right to Sue and filed a charge with the court system.")), such claim fails, among other reasons, on frivolity grounds. See, e.g., Henderson v. Wells Fargo, N.A., No. 5:23cv38, 2024 WL 1376487, at *8 (E.D.N.C. Mar. 29, 2024) ("Frivolous complaint are subject to dismissal pursuant to the inherent authority of court, even when the filing fees has been paid. A case is frivolous if it lacks an arguable basis in either law or fact. A claim lacks an arguable basis in fact when it describes factual contentions that are clearly baseless or it describes fantastic and delusional scenarios. [The plaintiff] theorizes that his failure to get hired is part of some grand conspiracy to drive him out of Fayetteville and North Carolina; he hypothesizes that people are afraid of his education, which makes them cowards. These statements and others peppered throughout [the plaintiff's] pleadings and response, evince that his claims have no grounding in fact. They are frivolous." (emphasis in original) (brackets, citations, and internal quotation marks omitted)).

[c]omplaint hardly fares better," explaining that, "[e]ven supplemented, the [c]omplaint continues with unsupported, conclusory allegations that preclude Defendants from providing meaningful responses" (internal quotation marks omitted)).

With the dismissal of Plaintiff's Title VII claims, only state-law claims remain. (See generally Docket Entry 3.) The Court "may decline to exercise supplemental jurisdiction over a [state-law] claim" if it, inter alia, "dismisse[s] all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). As the Supreme Court recently explained, in such "context[], federal law is not where the real action is. So although supplemental jurisdiction persists, the district court need not exercise it: Instead, the court may (and indeed, ordinarily should) kick the case to state court." Royal Canin U.S.A., Inc. v. Wullschleger, 604 U.S. 22, 32 (2025). Given the early stage of this litigation, the Court should decline to continue exercising supplemental jurisdiction over Plaintiff's remaining (state-law) claims. See, e.g., Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988) (identifying "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain" as an example of a situation in which "a case properly belongs in state court").

The Court should also remand this action to the Durham County Superior Court rather than dismissing it. See Hinson v. Norwest

32

<u>Fin. S.C., Inc.</u>, 239 F.3d 611, 617 (4th Cir. 2001) ("[U]nder the authority of 28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case or, in cases removed from State court, to remand, provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met."). When deciding "whether to remand the case to State court," the Court should, as relevant here, "consider principles of economy, convenience, fairness, and comity." <u>Id.</u> (internal quotation marks omitted). Particularly given the volume of material that Plaintiff has already submitted in this matter, remand to state court rather than dismissal best serves such principles. As the Supreme Court has explained:

> Both litigants and States have an interest in the prompt and efficient resolution of controversies based on state law. Any time a district court dismisses, rather than remands, a removed case involving pendent claims, the parties will have to refile their papers in state court, at some expense of time and money. Moreover, the state court will have to reprocess the case, and this procedure will involve similar costs. Dismissal of the claim therefore will increase both the expense and the time involved in enforcing state law.

<u>Carnegie-Mellon</u>, 484 U.S. at 353 (recognizing that, "[e]ven when the applicable statute of limitations has not expired, a remand may best promote the values of economy, convenience, fairness, and comity").

33

<u>**CONCLUSION**</u>

Plaintiff's federal claims fail as a matter of law, rendering appropriate remand of Plaintiff's remaining claims to state court.

**IT IS THEREFORE RECOMMENDED** that the Motion (Docket Entry 6) be granted in part as follows: (1) Plaintiff's Title VII discrimination and hostile work environment claims should be dismissed with prejudice, after which (2) this case should be remanded to the Durham County Superior Court.

This 3rd day of September, 2025.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
